IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 15-00034-01-CR-W-RK |
| ) | |
| MICHAEL L. EVANS, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

Defendant Michael Evans seeks to suppress a firearm which was discovered as the result of a search of his person following his arrest for rape on December 28, 2014. (Doc. #25) The government contends that after conducting a Terry[1] stop and then gathering additional evidence at the scene, the police had probable cause to arrest Evans for rape without a warrant on a 24-hour investigation hold.[2] (Doc. #28 at 2) For the reasons set forth below, it is recommended that defendant's motion to suppress be granted.

I. BACKGROUND

On March 12, 2013, the Grand Jury returned a one-count indictment against defendant Michael Evans. The indictment charges that on December 28, 2014, defendant Evans, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly

---

[1] An investigative detention, also known as a Terry stop, is "a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause." Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000). An officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." Id.

[2] The government cites Section 544.170.1 R.S.Mo. as authority to hold for investigation persons who are arrested for state offenses for twenty-four hours without a warrant.

1

possessed a .380 caliber pistol which had been transported in interstate commerce. An evidentiary hearing on the motion to suppress was held on September 30, 2015. Defendant Evans was represented by Assistant Federal Public Defender William Raymond. The government was represented by Assistant United States Attorney Christina Tabor. The government called Police Officer Kellen Story, Police Officer Jacqulynn Hobbs and Sergeant James Swoboda of the Kansas City, Missouri Police Department as witnesses.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On December 28, 2014, Ms. Linda Lilly contacted the Kansas City, Missouri Police Dispatcher to report a sexual assault that had occurred from "11:00 am[3] to 3:00 o'clock this morning. (Gov. Ex. 9 at 2) Ms. Lilly reported that she was back at the address where the rape had occurred to recover the used condom which the rapist had given her and which she had left in the bathroom of the apartment building where the rape had occurred. (Gov. Ex. 9 at 2)

2. In a second call while she waited for officers to arrive at the address where she was located, Ms. Lilly indicated that "he just got off the bus" at 11th and Grand and she recognized him because of his shoes. (Gov. Ex. 10 at 1) Ms. Lilly thought he appeared to be waiting for another bus as he had remained at the bus stop. (Gov. Ex. 10 at 2) Ms. Lilly told the dispatcher she was pretty sure the man who got off the bus was her rapist saying: "I'm pretty sure that's him. I mean how many other dudes around here walk around in the same God damn shoes." (Gov. Ex. 10 at 2)

3. On December 28, 2014, Police Officer Kellen Story of the Kansas City, Missouri Police Department was on patrol. (Tr. at 7) At approximately 3:00 p.m., he went to the area of 1006 Grand Avenue on a call for service. (Tr. at 8) The original call for service was a rape call where the victim was standing by. (Tr. at 8) The calling party, Linda Lilly, was right outside of 1006 Grand, the address associated with the rape, in a white Lexus. (Tr. at 9) As Officer Story was in route to 1006 Grand, he received a subsequent dispatch with a description of the suspect in the rape. (Tr. at 9) The dispatcher described the suspect as wearing an army vest with a yellow shirt

---

[3] It became clear during the interview of Ms. Lilly that she was alleging the rape occurred between 10 and 11 p.m. on December 27 and the early morning hours of December 28. (Tr. at 62)

and red and white Adidas tennis shoes and located at the bus stop at 11th and Grand. (Tr. at 9) Officer Jacqulynn Hobbs was also dispatched to the bus stop at 11th and Grand and given a description of the clothing that the suspect was wearing. (Tr. at 54) The clothing described was not the clothes worn by the suspect the night before; the only thing that was the same from the night before was the shoes. (Tr. at 55) Officer Hobbs was aware that Ms. Lilly told the 911 operator that she recognized the shoes and thought the shoes were significant. (Tr. at 55-56)

4. Officers Story and Hobbs arrived at the area of 1006 Grand at about the same time. (Tr. at 10, 40) Officer Story parked in front of the calling party's white Lexus and across from the bus stop at 11th and Grand. (Tr. at 10) Officers Story and Hobbs saw the suspect wearing the army vest with a yellow shirt under it and red Adidas tennis shoes as described by the dispatcher. (Tr. at 10-11, 39-40) Officers Story and Hobbs contacted the man, later identified as Michael Evans, the defendant. (Tr. at 11, 40) The defendant did not try to run or resist when approached by the officers who advised they were going to detain him for a minute. (Tr. at 20) The defendant asked why he was being detained and he seemed surprised that he was being stopped and detained. (Tr. at 20) While contacting Evans, Officer Story was wearing a body microphone and COBAN video. (Tr. at 11; Gov. Exs. 5 and 16) Officer Hobbs was also wearing a microphone and COBAN video which was operating. (Tr. at 42; Gov. Exs. 15 and 18)

5. As a safety precaution, Officer Story first asked defendant Evans to take his hands out of his pockets and show them to the officer. (Tr. at 12) Officer Story, assisted by Officer Hobbs, then placed defendant Evans in handcuffs. (Tr. at 12, 40-41) Officer Story placed the defendant into handcuffs because he knew that Officer Hobbs was going to be contacting the victim and that he would be left alone with the suspect. (Tr. at 12) After handcuffing the suspect, Officer Story assisted by Officer Hobbs, frisked him, but neither officer located anything of significance. (Tr. at 12-13, 41) At that point, the officers did not feel any weapons. (Tr. at 21, 57) It was December 28, and Mr. Evans had on a lot of clothing; nothing was felt because of the thick clothing. (Tr. at 57) At that time, defendant Evans was not under arrest, but he was not free to go. (Tr. at 13, 20, 56) He was being detained for investigation. (Tr. at 13) Officer Hobbs advised Evans that he was being investigated for a rape. (Tr. at 13) Evans' reaction was that he had nothing to do with a rape. (Tr. at 13) Officer Hobbs also asked defendant for his name, date of birth and other identifying information. (Tr. at 29) All of the information provided by the defendant was correct. (Tr. at 29, 58) Evans did not have any warrants. (Tr. at 58) Officer Hobbs interacted with Mr. Evans before she talked to the victim, Ms. Lilly, personally. (Tr. at 58)

6. Officer Hobbs left the location where Officer Story was with Evans to contact the victim who was across the street. (Tr. at 13) Officer Story detained Evans on the sidewalk at the bus stop while Officer Hobbs spoke with the victim. (Tr. at 14, 58) Officer Hobbs interviewed the calling party, Ms. Lilly, who was located directly

3

across the street from the bus stop, in front of UMB Bank, in a white Lexus. (Tr. at 41, 59, 61) Ms. Lilly indicated she went to that location to advise the police that there was a rape that happened there and that she had placed a used condom in a trash can in 1006 Grand in the lobby. (Tr. at 41) Officer Hobbs made a report concerning what Ms. Lilly told her during the interview which was admitted into evidence as Government's Exhibit 11. (Tr. at 42)

7. During the interview, Ms. Lilly indicated she met her attacker through a website or chat line and that she communicated with him via text. (Tr. at 46) Ms. Lilly was unwilling to identify the website on which she met her attacker. (Tr. at 46) Each time Officer Hobbs asked Ms. Lilly about the site, she would say she felt like the police were accusing her and she would get angry and upset. (Tr. at 65) No matter how many times Ms. Lilly was asked, she would not give details concerning the website. (Tr. at 66) When pressed as to how they met, Ms. Lilly said she did not want to give a statement. (Tr. at 67)

8. Ms. Lilly indicated the incident occurred on December 27, 2014, beginning around 10:00 or 11:00 p.m. and ending around 2:15 to 2:30 a.m. (Tr. at 62) Ms. Lilly believed she was with the suspect for three to four hours. (Tr. at 62) Ms. Lilly told both the dispatcher and Officer Hobbs that she did not see the rapist's face. (Tr. at 56, 62)

9. Ms. Lilly went to 1006 Grand, a loft apartment building, to "hang out." (Tr. at 46) She met her attacker on the day the rape occurred. (Tr. at 45, 70) When she went to 1006 Grand, her attacker was inside the building and let her in through the front door. (Tr. at 47, 68-69) He identified himself as Octavio or Octovi. (Tr. at 47, 67-68) Ms. Lilly walked with the person who let her in from the lobby to the elevators. (Tr. at 69) She went up in the elevator with him to the 15th floor and into the stairwell. (Tr. at 69) Despite meeting the person in the lobby, walking with him through the lobby, getting on the elevator and going to the stairwell with him, Ms. Lilly said she could not identify his face. (Tr. at 69)

10. Ms. Lilly assumed that her attacker lived in the building because he said he was married and they could not go to his room or apartment so they went to the 15th floor stairwell, where he said he smoked frequently and he knew no one visited. (Tr. at 47, 69)

11. Ms. Lilly indicated that the person she went into the stairwell with asked her to take off her shoes because he liked to suck on toes. (Tr. at 70) She took off her shoes and allowed him to do this because she was in fear. (Tr. at 70) Ms. Lilly advised that she willingly pulled her pants down leaving her underwear up. (Tr. at 51, 70, 72) She did this so her attacker would believe that she was not a police officer. (Tr. at 51, 70, 72) Officer Hobbs asked repeatedly if the victim had an arrangement to get money for sex. (Tr. at 67, 70-71) The officer asked this because the victim was being evasive about how she and the attacker met. (Tr. at 71)

4

12. Ms. Lilly indicated that the party across the street at the bus stop looked like the man who assaulted her. (Tr. at 45) She said the height, build, and skin tone were the same. (Tr. at 45) In addition, the man at the bus stop was wearing the same shoes as her attacker. (Tr. at 45)

13. Ms. Lilly also indicated there was a scar above her attacker's belly button.[4] (Tr. at 48, 56) Ms. Lilly explained to Officer Hobbs that during the rape her knees were on the stairs, she was kneeling down facing the stairs and she had to turn around to look behind her to try and see what was going on. (Tr. at 49) When she did this, she was able to see a scar on his belly—above the belly. (Tr. at 49, 62-63) In her report, Officer Hobbs noted that when the attacker was behind Ms. Lilly, he pulled up his shirt exposing a scar above his belly button approximately an inch or two in length. (Tr. at 64, 72) Ms. Lilly repeated that "[b]ecause the only thing I know it's him or not him because he had a scar like this big right above his belly button." (Tr. at 65) Officer Hobbs recounted that "[s]he said that's all she could see was a scar above his belly button …." (Tr. at 73) Officer Hobbs repeatedly testified that Ms. Lilly told her that the person had a scar. (Tr. at 86)

14. There was a passenger in the car with Ms. Lilly while she was talking to the police. (Tr. at 74) The passenger and Ms. Lilly were talking about Ms. Lilly going across the street to look at the suspect to see if he had this scar. (Tr. at 74) In Ms. Lilly's mind, this was one way to make sure she was correct that this was the right person. (Tr. at 74)

15. Ms. Lilly also told Officer Hobbs that there were possibly tattoos on her attacker's hand, but she was not able to clearly see if there were tattoos because his hands were covered. (Tr. at 49, 56) She also told Officer Hobbs that the person had tattoos on his neck. (Tr. at 56) Ms. Lilly was also worried that "it might not be him." (Tr. at 56)

16. Ms. Lilly had provided a condom for the rapist to use. (Gov. Ex. 11 at 3; Tr. at 50) Following the attack, Ms. Lilly kept the used condom, wrapped it up and hid it in a female restroom in the lobby. (Tr. at 50) The purpose was to save it. (Tr. at 50) This is why she returned to the building on December 28 and contacted 911. (Tr. at 50)

17. Ms. Lilly indicated that she was afraid of resisting or fighting back during the rape because she was afraid she was going to be injured on the concrete stairs. (Tr. at 50) The attacker took her phone, and she found out later that he had deleted text messages and phone calls between the two parties. (Tr. at 51) However, text messages that the attacker had sent after the attack were still on her phone. (Tr. at 75) Ms. Lilly

---

[4] Initially, Ms. Lilly indicated that the scar was on the belly button, but she later corrected it to say above the belly button. (Tr. at 48)

5

showed Officer Hobbs her phone with the text messages while at the investigative scene. (Tr.at 75-77) Defendant's Exhibit 10 is a copy of what was on the screen of Ms. Lilly's phone and the text messages. (Tr. at 75-76) The phone number of the person who texted her, the person she knew as Octovi, was on the screen of Ms. Lilly's phone. (Tr. at 76) The first text from the person said "You're so sexy," and Ms. Lilly responded "Thank you." (Tr. at 76) He also asked "You okay?" and she responded "I'm okay." (Tr. at 76) The phone messages indicated Ms. Lilly was having contact with her attacker after the attack and there was nothing in the messages that said rape. (Tr. at 77)

18. At some point Sergeant James Swoboda arrived to participate in the investigation. (Tr. at 15) Mr. Evans told Sergeant Swoboda that he was there to catch a bus, that he had an event that night, that he was catching the bus to give blood to get some money and that he did not rape anyone. (Tr. at 28) After talking to Mr. Evans, Sergeant Swoboda went over to talk to the calling party, Ms. Lilly. (Tr. at 28)

19. When Sergeant Swoboda arrived to talk to the calling party, Officer Hobbs updated him on what she had, what Ms. Lilly had told her including information about the details of the rape and the condom left in the building. (Tr. at 52, 77-78) Sergeant Swoboda was standing with Hobbs for most of what Ms. Lilly said. (Tr. at 119) Sergeant Swoboda was advised the victim had met her attacker on the internet and that she recognized his Adidas, body type and complexion. (Tr. at 78, 119-20) Sergeant Swoboda indicated that when he first heard the story, he was skeptical since Ms. Lilly was identifying her attacker off of a pair of shoes originally. (Tr. at 120)

20. Swoboda went to the women's bathroom in the lobby of 1006 Grand. (Tr. at 103-04) The victim said she had put evidence from the rape in a wastebasket in the corner of the bathroom in the lobby. (Tr. at 104) The victim said she was trying to preserve evidence from the rape. (Tr. at 104) Sergeant Swoboda found what appeared to be a used condom wrapped inside a paper towel in the corner of a wall-mounted trash can. (Tr. at 104) Sergeant Swoboda called in the sex crimes unit and the crimes scene investigation unit. (Tr. at 105)

21. Swoboda asked Ms. Lilly if she was just driving around that day when she saw the suspect's shoes and said that's him? (Tr. at 78, 120) In response, Ms. Lilly indicated she came back because the condom was in the bathroom and she wanted to get it from where she had hidden it. (Tr. at 78-79) She indicated that she then saw him getting off the bus, and he was the same size and the same complexion. (Tr. at 79) She also advised Swoboda that the attacker had a tattoo on his neck, but that she could not see what it was because it was dark, and he had tattoos on his hands. (Tr. at 79) She also told Sergeant Swoboda that she did not see her attacker's face. (Tr. at 79)

22. While Swoboda was talking to Ms. Lilly, she indicated that her attacker had a scar "this big" above his belly button. (Tr. at 79) Ms. Lilly explained that the attacker

6

had his hands up and his shirt was then up and that is how she saw the scar. (Tr. at 124) The thing that Sergeant Swoboda wanted to check was the scar on the suspect's stomach. (Tr. at 121) If the suspect did not have a scar, they would have been done and if he did, they would look into it some more. (Tr. at 121) Sergeant Swoboda testified that Ms. Lilly never said she saw a scar below his belly button. (Tr. at 122) She told Swoboda the scar was above his belly button. (Tr. at 122, 123, 124) When asked if Ms. Lilly described the scar above his belly button as one to two inches in length, Sergeant Swoboda said he did not recall. (Tr. at 122) Ms. Lilly also repeated to Sergeant Swoboda that "And he's got tattoos on his hand and his neck." (Tr. at 124, Gov. Ex. 15 at 10) Ms. Lilly also asked Sergeant Swoboda "[d]id you see he has a tattoo on his neck and his hands?" (Gov. Ex. 15 at 11) Sergeant Svoboda said "I did not go that far yet, I'm waitin' for the detective say so …" (Gov. Ex. 15 at 12)

23. According to Officer Hobbs, at some point Sergeant Swoboda went over and looked at Mr. Evans. (Tr. at 79-80) He then came back and asked Ms. Lilly about the scar. (Tr. at 80) He asked Ms. Lilly to tell him about the scar and what it looked like. (Tr. at 80) She responded by demonstrating the length. (Tr. at 80) When Swoboda asked if it looked "like a surgical scar" she said "almost, but you don't see like the stitches or nothing. Maybe he got stabbed or [inaudible]." She also points to where the scar was in relation to his belly button. (Tr. at 80) Swoboda asks if the scar was below his belly button and she says right above his belly button. (Tr. at 80-81) Sergeant Swoboda acknowledged in his testimony that the victim told him several times that the scar she saw was above her attacker's belly button. (Tr. at 132) She also told Swoboda that the attacker had tattoos on his hands and neck. (Tr. at 81) Officer Hobbs does not know if Sergeant Swoboda went over to look at the defendant to see if he had tattoos on his hands or neck. (Tr. at 81)

24. Sergeant Swoboda testified that after talking to the victim, he walked over to the suspect and explained that the woman across the street was making serious allegations about him. (Tr. at 105) Swoboda told him that it would clear up a lot of things if he could take a look at Evan's stomach and see if there was a scar. (Tr. at 105) Evans said he did not have a scar. (Tr. at 105) However, Evans said it would be okay for Swoboda to look at his stomach. (Tr. at 106) Sergeant Swoboda testified he "found a scar, it was a vertical scar, like a vertical line. It looked like a surgical scar, but it didn't have stitch marks on it and there was a little bit of a scar above his belly button. And then the scar ran downward below his belly button into the groin area." (Tr. at 106) Swoboda indicated the scar was about six inches. (Tr. at 106) Officer Story also looked at defendant's stomach while Sergeant Swoboda was examining him and saw a scar directly below his belly button. (Tr. at 15-16) Officer Story thought that the scar looked like an incision. (Tr. at 16) When Sergeant Swoboda asked defendant if he had ever had surgery that left a scar, the defendant denied having been stabbed or anything. (Tr. at 109) When Swoboda asked him about the scar below his belly button, defendant said it was from a spider bite in 2004. (Tr. at 109) Swoboda said it did not appear to be a spider

7

bite to him. (Tr. at 110)

25. During his testimony, Sergeant Swoboda examined a photograph of Mr. Evans' abdomen taken on the day of his arrest, Government's Exhibit 17, and circled two areas where he indicated there were scars. (Tr. at 106-07)

26. Sergeant Swoboda did not see any tattoos on Evans' hands or neck at the scene. (Tr. at 133)

27. Swoboda asked Ms. Lilly if she was being 100 percent truthful or if she was only telling 80 percent of the truth. (Tr. at 126) Swoboda also asked her if any money changed hands, if any drugs were involved and why she did not call the police that morning. (Tr. at 82, 126) Ms. Lilly denied that there was ever an agreement for sex. (Tr. at 97) In response to a question asking if there was a money transaction, she replied: "No, I didn't get any money." (Tr. at 98; Gov. Ex. 15 at 11) She also denied that drugs were involved. (Tr. at 98) At some point, Officer Hobbs called the sex crimes detectives and told them the important details that Ms. Lilly had shared. (Tr. at 82)

28. During her testimony, Officer Hobbs was shown pictures taken of Mr. Evans on the day he was arrested. (Tr. at 83) She testified that the pictures reflected that Mr. Evans did not have tattoos on his neck or his hands, only on his forearms. (Tr.at 83) The parties also stipulated that Mr. Evans does not have tattoos on his neck or hands. (Tr. at 84) When shown a picture of the defendant's abdomen, Defendant's Exhibit 6, Officer Hobbs testified that she did not see a scar one to two inches in length above defendant's belly button. (Tr. at 86)

29. Officer Hobbs testified that at some point "Sarge told us to go ahead and put him in the back of the wagon." (Tr. at 85) Officer Hobbs testified, "I didn't place him under arrest. I was told to." (Tr. at 85) Sergeant Swoboda advised the officers over the radio to place Mr. Evans under arrest for rape. (Tr. at 87-88) Officer Hobbs did not make the probable cause decision, Sergeant Swoboda did. (Tr. at 97-98)

30. Prior to arresting Evans, Officer Hobbs did not take Ms. Lilly over to see the area around Evans' belly button, she did not bring Evans over so that Ms. Lilly could get a closer look, and she did not call the cell number from which Ms. Lilly had received a text after the rape. (Tr. at 89-90)

31. After Evans became aware he was under investigation for rape, his behavior changed. (Tr. at 14) He became verbally combative, argumentative, attempted to call out to the calling party and also attempted to stand up and move so that she could see him. (Tr. at 14-15) The defendant was being argumentative and combative in saying, I did not rape anybody. (Tr. at 21) Defendant repeatedly said he did not rape anybody. (Tr. at 25) Defendant repeatedly asked to have the lady come closer and

8

look at him so she will see that "it's not me." (Tr. at 25-26, 28) Evans asked Sergeant Swoboda several times to have the lady come over and look at him up close. (Tr. at 129) Sergeant Swoboda indicated to Evans that "The thing is, I … I was almost 100 percent sure it wasn't you or whatever, but she did say there was a scar right below your belly button which you do have." (Gov. Ex. 16 at 9) Evans claimed that what Sergeant Swoboda had seen was a spider bite. (Gov. Ex. 16 at 9-10)

32. At approximately 3:26 p.m., Officer Story placed the defendant under arrest for rape at the instruction of Sergeant Swoboda. (Tr. at 16) Officer Story sat with the defendant at the bus stop for 30 to 45 minutes before the defendant was placed under arrest. (Tr. at 25, 87) Officer Story had no involvement in the decision to place the defendant under arrest for rape nor in the probable cause analysis. (Tr. at 16) Officer Story does not know why or on what Sergeant Swoboda was basing the decision to arrest the defendant. (Tr. at 29)

33. After placing the defendant under arrest for rape, Officer Story conducted a search incident to arrest. (Tr. at 16-77) Officer Story located a silver Lorcin .380 handgun in the defendant's left jacket pocket. (Tr. at 17) Officer Story explained that he did not feel the gun during the initial frisk because the jacket was very puffy and the defendant had on several layers of clothing. (Tr. at 17) Only after he was placed under arrest for rape was the gun located. (Tr. at 88)

34. Sergeant Swoboda testified concerning the factors that led him to decide to arrest Mr. Evans for rape:

> There was a number of facts when all put together led me to that decision. The first was that the victim of the rape had pointed him out and identified him as the suspect. The second fact that she was able to describe a scar that he had on his stomach from across the street which nobody could see. The third factor was when we asked about the scar, he lied to us and said he did not have a scar. The fourth fact was that he was still in the vicinity of the crime, relatively a few hours after when it was supposed to have occurred. And she was—and the physical description she had originally given us matched the suspect, including one of the items he was wearing which really stood out, according to the victim, was his red Adidas shoes.
>
> \* \* \*
>
> And then the last and final item was the used condom that she said she had put in the waste can to preserve as evidence that we found at the scene.

(Tr. at 111)

35. Sergeant Swoboda acknowledged that Evans was in the vicinity of the rape twelve

9

hours after the rape. (Tr. at 132) Further, he testified that the fact that a condom was found means someone had sex with Ms. Lilly or raped her, but it does not tell who that person was. (Tr. at 133)

36. While at the location, Sergeant Swoboda also heard about a similar rape at 1006 Grand on December 26, 2014, and thus, he was concerned about the possibility of a serial rapist. (Tr. at 112)

37. Mr. Evans had two keys on his person at the time of his arrest. (Tr. at 113) Sergeant Swoboda did not attempt to see if the keys would unlock the entry door at 1006 Grand, as he felt the keys were irrelevant. (Tr. at 113) He also did not ask the manager at 1006 Grand if she recognized the defendant. (Tr. at 113) This would not have affected his probable cause decision, as the fact that Mr. Evans did not live there would not rule him out as a suspect. (Tr. at 114) While it was a secure building, Sergeant Swoboda indicated that there was a lot of foot traffic in and out of the building and to enter the building all you had to do was wait for the door to open. (Tr. at 114) Sergeant Swoboda did not ask the manager if a person by the name of Octovi or Octavio lived in the building as he did not know if that was the suspect's true name. (Tr. at 115) Sergeant Swoboda doubted that the attacker would have given his real name, and he did not know if the suspect actually lived in the building. (Tr. at 116)

38. Sergeant Swoboda did not direct that Evans' neck be examined for tattoos. (Tr. at 114) As he asked questions of Ms. Lilly, she indicated that her attacker was wearing a long-sleeved shirt that covered part of his hand and she thought she had seen the tip of a tattoo on one hand. (Tr. at 114) Ms. Lilly asked her attacker if he had tattoos on one hand and he said both, but she had not seen tattoos on both hands—only a partial of what she thought might have been a tattoo. (Tr. at 114)

39. When Sergeant Swoboda asked Ms. Lilly about the neck tattoo, she said she thought he had a tattoo on his neck, but it was dark and she was not sure what it was. (Tr. at 114-15) So with that information, Sergeant Swoboda was not sure the suspect had tattoos. (Tr. at 115) He further indicated that the attacker could have had a stamp on his hands or a temporary tattoo that was sprayed on or a sticker. (Tr. at 115) Therefore, a lack of tattoos on the suspect would not have affected Sergeant Swoboda's probable cause decision. (Tr. at 115)

40. Sergeant Swoboda was not the reporting officer so he did not write a report about the incident, but he did review the report prepared by Officer Hobbs, but not for the purpose of approving it. (Tr. at 117-18) At the time of the incident, Officer Hobbs was a relatively new officer with under three years of experience and Officer Story was also a new officer. (Tr. at 117)

41. The condom located at the building was subsequently processed for DNA and Mr. Evans was excluded as a contributor of the DNA found in the condom. (Tr. at 53)

10

This information was not known by the officers on the day of their investigation. (Tr. at 53; Defendant's Ex. 11, the DNA crime lab report)

III. DISCUSSION

Defendant contends that because the police did not have an arrest warrant or probable cause to arrest him, the search incident to his arrest violated the Fourth Amendment to the United States Constitution and, therefore, the firearm found on his person during this arrest must be suppressed. (Doc. #25 at 5) In opposing defendant's motion, the government first contends that reasonable suspicion sufficient to justify a Terry stop existed in the circumstances of this case. (Doc. #28 at 2-3) Defense counsel does not dispute this argument. Although two police officers conducted a frisk of Mr. Evans when he was initially stopped for questioning, no weapon was found at that time. (See Fact Nos. 5, 33) It was not until defendant was arrested for rape and searched incident to arrest that the gun which defendant seeks to suppress was located. Thus, the issue before the Court is whether probable cause existed to arrest the defendant.[5]

A. Legal Standard for Determining Probable Cause

Police may arrest someone without a warrant if the officer has probable cause to believe the person has or is committing a crime. See Devenpeck v. Alford, 543 U.S. 146, 152 (2004). The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances. See United States v. McGlynn, 671 F.2d 1140, 1143 (8th Cir. 1982). Further, whether probable cause exists is to be assessed in terms of the circumstances confronting a reasonably cautious and prudent officer

---

[5] There is no claim by the government that the probable cause standard is inapplicable to an arrest where officers intend to detain a person on a 24-hour investigation hold pursuant to Section 544.170.1 R.S.Mo.

11

Case 4:15-cr-00034-RK   Document 37   Filed 11/09/15   Page 11 of 17

who is entitled to assess the circumstances in light of his experience. Id. at 1143-44. In discussing the issue of whether officers have probable cause for a warrantless arrest, the Eighth Circuit has provided the following guidance:

> "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (internal quotation omitted).
>
> Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest. United States v. Webster, 625 F.3d 439, 442 (8th Cir. 2010). Instead, the mere "probability or substantial chance of criminal activity, rather than an actual showing of criminal activity," is all that is required. United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005). In making a probable cause determination, "[l]aw enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." United States v. Henderson, 613 F.3d 1177, 1181 (8th Cir. 2010) (internal quotation omitted).

United States v. Winarske, 715 F.3d 1063, 1066-67 (8th Cir. 2013). Despite the latitude given to officers in interpreting and drawing inferences from factual circumstances, this latitude is not without limits. In the context of an action against a police officer pursuant to 42 U.S.C. § 1983 where plaintiff alleged the officer had no probable cause for the arrest, the Eighth Circuit discussed the limitations imposed on the latitude afforded law enforcement officers making warrantless arrests:

> First, because the *totality* of circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause. An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists. See Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir.), cert. denied, 488 U.S. 822 (1988). In this sense, the Fourth Amendment requires that we analyze the weight of all the evidence—not merely the sufficiency of the incriminating evidence—in determining whether Burtis had probable cause to arrest Kuehl for simple assault. For example, an officer may make an arrest if a

12

credible eyewitness claims to have seen the suspect commit the crime, see United States v. Easter, 552 F.2d 230, 233–34 (8th Cir.), cert. denied, 434 U.S. 844 (1977), but the officer may not arrest the suspect if, in addition, the officer is aware of DNA evidence and a videotaped account of the crime that conclusively establish the suspect's innocence. See, e.g., Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1257 (10th Cir. 1998)(no probable cause to arrest plaintiff for shoplifting despite security guards' informing police that plaintiff stole merchandise, where officers viewed videotape rebutting guards' account and where plaintiff explained her actions to officers and produced receipts for the merchandise in question).

Second and relatedly, law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as "law enforcement would not [be] unduly hampered ... if the agents ... wait[ ] to obtain more facts before seeking to arrest." See United States v. Woolbright, 831 F.2d 1390, 1394 (8th Cir. 1987); United States v. Everroad, 704 F.2d 403, 407 (8th Cir. 1983); see also 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.2(d), at 47–48 (3d ed. 1996). An officer need not conduct a "mini-trial" before making an arrest, Brodnicki v. City of Omaha, 75 F.3d 1261, 1264 (8th Cir.), cert. denied, 519 U.S. 867 (1996); Morrison v. United States, 491 F.2d 344, 346 (8th Cir. 1974), but probable cause does not exist when a "minimal further investigation" would have exonerated the suspect. See Bigford, 834 F.2d at 1219; BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)(a police officer "may not close her or his eyes to facts that would help clarify the circumstances of an arrest"); Romero v. Fay, 45 F.3d 1472, 1476–77 and n. 2 (10th Cir. 1995)(police need not interview alleged alibi witnesses but must "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention"); Sevigny v. Dicksey, 846 F.2d 953, 956–58 (4th Cir. 1988)(no probable cause where officer unreasonably failed to interview witnesses at scene of automobile accident who would have corroborated plaintiff's version of story); Baptiste, 147 F.3d at 1259 (officers may weigh the credibility of witnesses in making a probable cause determination, but they may not ignore available and undisputed facts). Cf. Brodnicki, 75 F.3d at 1264 (no duty to investigate suspect's proffered alibi prior to arrest); Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988) (suspect's plausible explanation of events held not to require officer "to forego arrest pending further investigation if the facts as initially discovered provide probable cause").

Kuehl v. Burtis, 173 F.3d 646, 650-51 (8th Cir. 1999).

### B. Application of the Probable Cause Standard to the Facts of the Case

Judged by these basic principles, the Court concludes that officers lacked probable cause

13

to arrest defendant Evans on December 28, 2014. First, the fact that the person identified by the victim at the bus stop was of the same general height, weight and complexion as the attacker is not sufficiently descriptive to establish probable cause. Nor is his wearing of red Adidas tennis shoes. As noted by defendant in his briefing, today red Adidas tennis shoes are not so unusual or unique as to establish probable cause.

The victim indicated she could not identify the defendant's face, but repeatedly said the attacker had a scar above his belly button which she described as one to two inches in length, had a tattoo on his neck and appeared to have tattoos on his hands. (See Fact Nos. 8, 9, 13, 15, 21, 22, 23)

Sergeant Swoboda discounted the victim's description of the tattoos on her attacker's neck, in part, because of the lighting conditions in the stairwell which did not allow her to see what the neck tattoo depicted. (See Fact No. 39) The areas on defendant's abdomen below the belly button circled by Sergeant Swoboda on Exhibit 17 as the "scar" appear to be a slight discoloration of the skin in a line directly below the belly button. The area above the belly button, which Sergeant Swoboda circled as indicating a scar, appears to be something the size of a thumbnail and could as easily be several hair follicles as a scar. Moreover, in addition to the darker line running from below his belly button into his groin area, this defendant has other areas below his belly button which appear to be darker spots on his skin. Not only was this darker skin pigmentation not mentioned by the victim, but if his neck tattoo could not be accurately observed in the lighting conditions, as Sergeant Swoboda concluded, it is difficult to see how this skin discoloration could have been observed by the victim. More significantly, none of the areas of darker skin pigmentation below defendant's belly button matched the victim's description of the scar **above** her attacker's belly button. Defendant Evans did not have a one to

14

two inch scar on or above his belly button as described by the victim, nor did he have any noticeable scar in this area. He did not have a tattoo on his neck and did not have tattoos on his hands. (See Fact Nos. 26, 28) Thus, with respect to the key identifying characteristics of the attacker, the defendant did not match the victim's description of her assailant.

Sergeant Swoboda also claimed that part of his probable cause analysis included the fact that defendant was still in the vicinity of the crime a few hours after it was alleged to have occurred. (See Fact No. 34) However, as the Sergeant acknowledged, by the time they were interviewing defendant more than twelve hours had elapsed since the victim was able to leave the building where her attack was alleged to have occurred. (See Fact No. 35) Further, the victim told the officers, including Sergeant Swoboda, that she saw the person she thought was her attacker get off a bus at 11th and Grand and remain at the bus stop waiting for another bus. (See Fact Nos. 2, 21) The fact that the defendant got off the bus at 11th and Grand and was waiting to transfer from one bus to another would not necessarily be consistent with someone who had remained in the area of 11th and Grand following the rape.

The victim was located across the street from the alleged attacker throughout the course of the investigation and no effort was made to have the victim observe the defendant at a closer range or to examine his abdomen for the presence of a scar, even though this possibility was mentioned both by the victim and Evans. (See Fact Nos. 14, 30, 31) Nor did the officers check to see if defendant had a cell phone with the same number that appeared on the text messages sent by the attacker to the victim after her rape. (See Fact Nos. 17, 30)

In addition to these facts which negate the existence of probable cause, Eighth Circuit case law holds that the officers may weigh the credibility of the complaining witness in making the probable cause determination. Here, the officers were concerned that the victim was not

being truthful. (See Fact Nos. 7, 11, 27) The victim stated that she met her alleged attacker online, but would not identify the website and was evasive concerning how the online chat led to an in-person meeting. (See Fact No. 7) In fact, the victim threatened not to give a statement if she continued to be questioned about these issues. (See Fact No. 7) The victim alleged she had not seen her attacker's face, even though she met him in the lobby of a loft building, walked to the elevators with him, rode to the 15th floor and agreed to go into a stairwell rather than to his apartment because of his explanation that his wife was present at the apartment. (See Fact No. 9) The victim indicated that she was fearful of her attacker who raped her for hours yet, at her request, he used a condom which she was able to retain after leaving the stairwell. (See Fact No. 16) Rather than fleeing from the building where she had been attacked following her release by the rapist, the victim went into the restroom in the lobby of the building and hid the used condom so that she could retrieve it at a later time. (See Fact Nos. 1, 16, 20)

The fact that a condom was located where the victim alleged it would be does not provide probable cause to believe the defendant committed the rape. While it did confirm one piece of information provided by the victim, it certainly did not answer the other questions noted above with respect to how the victim was able to obtain the used condom and why she took time to hide it in the building where she was attacked despite her desire to distance herself from her attacker following her release.

On more than one occasion, the officers suggested the victim was not being truthful with them. (See Fact No. 27) Many of the questions which the officers directed to the victim were indicative of the significant concern they had with respect to the victim's credibility and truthfulness.

IV. CONCLUSION

On the basis of these facts, the Court concludes that officers lacked probable cause to arrest defendant Evans for rape on December 28, 2014. The firearm was discovered as the result of a search of defendant's person incident to his arrest. Therefore, defendant's motion to suppress must be granted. Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting defendant's Motion to Suppress Evidence With Suggestion in Support (doc #25).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                          */s/* Sarah *W. Hays*
                                                                SARAH W. HAYS
                                          UNITED STATES MAGISTRATE JUDGE